*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 13-CV-724 and 13-CV-725

NAYEREH SAHRAPOUR, ET AL., APPELLANTS,

V.

LESRON, LLC

and

SHAW CENTRE, LLC

APPELLEES.

Appeals from the Superior Court
of the District of Columbia
(CAR-3370-08)

(Hon. Natalia Combs-Greene, Trial Judge)

(Argued September 30, 2014                    Decided July 9, 2015)

*Seann P. Malloy* for appellants Nayereh Sahrapour and George Beheshtian.

*Mikhael D. Charnoff*, with whom *Douglas P. Rucker, Jr.* was on the brief, for appellants Robert W. Haas, Haas & Associates, P.C., and Sovereign Title Company.

*David H. Cox*, with whom *Christopher A. Glaser* was on the brief, for appellee LesRon, LLC.

*Benjamin A. Klopman*, with whom *Laurance J. Ochs* was on the brief, for appellee Shaw Centre, LLC.

Before BECKWITH and MCLEESE, *Associate Judges*, and NEWMAN, *Senior Judge*.

Opinion for the court by *Associate Judge* MCLEESE.

Dissenting opinion by *Senior Judge* NEWMAN at page 27.

MCLEESE, *Associate Judge*:  Appellants Nayereh Sahrapour, George Beheshtian, Robert Haas, Haas & Associates, P.C., and Sovereign Title Company appeal from orders granting summary judgment to appellees Shaw Centre, LLC and LesRon, LLC and vesting title to a disputed alleyway in LesRon.  Appellants claim that Ms. Sahrapour purchased the disputed alleyway from Shaw Centre and that Shaw Centre acted unlawfully by subsequently purporting to sell the alleyway to LesRon.  The trial court held that both the purchase agreement between Ms. Sahrapour and Shaw Centre and a subsequent deed were unambiguously contrary to appellants' claim.  The trial court therefore refused to consider extrinsic evidence as to the meaning of those documents.  We find both the purchase agreement and the deed to be ambiguous.  We therefore remand to the trial court for further proceedings.

**I.**

The following facts are undisputed. Shaw Centre owned two adjacent buildings, one at 1230 9th Street, NW and one at 1232 9th Street, NW. An alleyway that is approximately four feet wide runs between the buildings. In May 2006, Shaw Centre agreed to sell 1230 9th Street to Ms. Sahrapour. Attorney Robert Haas represented Ms. Sahrapour in the transaction. The purchase agreement states that 1230 9th Street consisted of "approximately 3,027 square feet of land . . . legally described as Lots 878, Block/Square 0368, Map 40 C." The property located at 1230 9th Street measures 3,026.4 square feet when the alleyway at issue is included and 2,777.5 square feet when the alleyway is excluded. The purchase agreement further states that it is binding and that "the provision hereof shall survive the execution and delivery of the deed aforesaid and shall not be merged therein."

Mr. Haas prepared the deed for the sale of 1230 9th Street. The deed states that Shaw Centre conveyed to Ms. Sahrapour "Lots 21 and 28 in Ambrose Roth's Subdivision of Lots in Square 368." Lots 21 and 28 in Square 368 describe the property located at 1230 9th Street without the alleyway; the alleyway is located in

Lot 22. The deed also identifies the tax lot as "Square 368, Lots 877 and 878." Tax lot 877 does not exist, and tax lot 878 describes only the front portion of the property located at 1230 9th Street. The back portion of 1230 9th Street and the disputed alleyway lie in tax lot 885. The deed also states that the property was conveyed "TOGETHER WITH all improvements thereupon, and the rights, alleys, ways, waters, privileges, appurtenances and advantages thereto belonging, or in anywise appertaining." The deed was recorded in October 2006.

In May 2007, Shaw Centre contracted to sell the adjacent property located at 1232 9th Street to Ronald and Leslie Schreiber, owners of LesRon. The original purchase agreement describes the property to be conveyed as "1232-9th Street, Northwest Washington DC Square 0368 Lot 0885." At some point after the purchase agreement was signed, Ms. Sahrapour's husband, George Beheshtian, informed Mr. Schreiber that Ms. Sahrapour had already purchased the alleyway between 1232 9th Street and 1230 9th Street. Mr. Haas also informed LesRon's counsel of Ms. Sahrapour's claim. Shaw Centre and LesRon subsequently modified the purchase agreement to explicitly include the alleyway. A special warranty deed reflecting the sale of 1232 9th Street was recorded on August 14, 2007. The alleyway is included in the property description in this deed.

Mr. Haas subsequently amended the October 2006 deed between Shaw Centre and Ms. Sahrapour to specifically reflect the conveyance of the alleyway to Ms. Sahrapour. Mr. Haas changed the designation from tax lot 877 to tax lot 885. He also added that "a portion of Lot 22 as shown on the attached survey" was conveyed to Ms. Sahrapour.

LesRon sued appellants, seeking a declaration that the amended deed was void; money damages for slander of title; money damages for trespass; and a permanent injunction enjoining further trespass. Ms. Sahrapour and Mr. Beheshtian brought a cross-claim against Shaw Centre, seeking damages for breach of contract; an order requiring Shaw Centre to record a deed or instrument confirming the boundaries of the property that Ms. Sahrapour had purchased; an order quieting title in and to the disputed alleyway; and indemnification if LesRon prevailed in its suit.

Appellants proffered extrinsic evidence in support of their claim that Ms. Sahrapour purchased the alleyway. Specifically, appellants claimed that the real-estate agent stated that the alleyway was included in the sale; that a location drawing confirmed by both parties at the closing indicated the alleyway was included in the sale; and that Shaw Centre sealed the entrances from 1232 9th

Street to the alleyway and provided a key to the door in the back of the alleyway to Ms. Sahrapour. Appellees disputed appellants' extrinsic evidence and countered with extrinsic evidence of their own.

The trial court held that the purchase agreement between Shaw Centre and Ms. Sahrapour and the October 2006 deed were both unambiguous and that extrinsic evidence therefore could not be considered. The trial court also concluded that the purchase agreement merged with the October 2006 deed and that the October 2006 deed therefore represented the final written agreement between the parties. The trial court granted summary judgment in favor of appellees, vested title to the alleyway in LesRon, and declared the amended deed prepared by Mr. Haas void.[1]

---

[1] Although the trial court did not resolve all of the claims and counterclaims in the case, we have jurisdiction because appellants seek review of an order "changing or affecting the possession of property." D.C. Code § 11-721 (a)(2)(C) (2012 Repl.). Some of the appellants were not formally parties to this case in the trial court but nevertheless were permitted to participate on the merits because they were parties in closely related cases. The parties dispute whether those appellants have standing to participate in the present appeal. We need not decide that issue, however, because Ms. Sahrapour was a party in the trial court and has standing to raise all of the arguments being raised in this appeal. *See, e.g.*, *Hazel v. Berry*, 580 A.2d 110, 110 n.3 (D.C. 1990) (because some appellants had standing, court did not need to decide whether another did as well).

**II.**

We interpret contracts and deeds under the "objective" law of contracts, meaning that the written language of the contract "govern[s] the rights and liabilities of the parties, regardless of the intent of the parties at the time they entered into the contract, unless the written language is not susceptible of a clear and definite under[stand]ing, or unless there is fraud, duress, or mutual mistake." *DSP Venture Grp., Inc. v. Allen*, 830 A.2d 850, 852 (D.C. 2003) (internal quotation marks and brackets omitted); *see also Joyner v. Estate of Johnson*, 36 A.3d 851, 855 (D.C. 2012) (applying "objective" law of contracts to deeds).

We review de novo a trial court's ruling as to whether a contract or deed is ambiguous. *Joyner*, 36 A.3d at 857; *BSA 77 P Street LLC v. Hawkins*, 983 A.2d 988, 993 (D.C. 2009). A contract or deed is ambiguous if "it is, or the provisions in controversy are, reasonably or fairly susceptible of different constructions or interpretations, or of two or more different meanings . . . ." *Joyner*, 36 A.3d at 856 (internal quotation marks omitted). A contract or deed is not ambiguous if "the court can determine its meaning without any other guide than a knowledge of the simple facts on which, from the nature of language in general, its meaning depends." *Id.* (internal quotation marks omitted).

If a court determines that a contract or deed is ambiguous, "the court -- after admitting probative extrinsic evidence -- must determine what a reasonable person in the position of the parties would have thought the disputed language meant." *Dyer v. Bilaal*, 983 A.2d 349, 355 (D.C. 2009) (internal quotation marks omitted); *see also Foundation for Preservation of Historic Georgetown v. Arnold*, 651 A.2d 794, 796 (D.C. 1994).[2]

### III.

### A.

We turn first to the purchase agreement between Shaw Centre and Ms. Sahrapour. The trial court concluded that the purchase agreement "merged" with the deed, and that the deed therefore was the document that determined the rights of the parties with respect to the property at issue. It is true that, in general, the

---

[2] At one time, this jurisdiction drew distinctions between latent and patent ambiguities, permitting extrinsic evidence to be considered in resolving the former but not the latter. *See, e.g.*, *Harten v. Loffler*, 29 App. D.C. 490, 503 (1907). That rule was long ago abolished in this jurisdiction. *See, e.g.*, *Mitchell v. Merriam*, 88 U.S. App. D.C. 213, 215, 188 F.2d 42, 44 (1951) ("Distinctions between 'latent' and 'patent' ambiguities are arbitrary and outmoded."). We therefore need not decide whether any ambiguities in the documents at issue were latent or patent.

provisions of a purchase agreement that are satisfied by the delivery of a deed merge into a subsequently delivered deed. *Haviland v. Dawson*, 210 A.2d 551, 554 (D.C. 1965). Such merger would "extinguish" the parties' rights under the purchase agreement. *Burka v. Crestview Corp.*, 321 A.2d 853, 855 (D.C. 1974). In the present case, however, the purchase agreement states that the agreement "shall not be merged" with the deed. Thus, the provisions of the purchase agreement do not merge into the deed, and appellants remain free to assert rights arising under the purchase agreement. *See, e.g.*, *Meyers v. Antone*, 227 A.2d 56, 57 (D.C. 1967) (rejecting argument that sales contract merged into deed, because sales contract stated that provisions of sales contract "shall not be merged" into deed).

We further conclude that the purchase agreement is ambiguous as to whether the alleyway was included in the sale. The purchase agreement states that 1230 9th Street consists of "approximately 3,027 square feet of land . . . legally described as Lots 878, Block/Square 0368, Map 40 C . . . ." Nothing in the agreement -- neither the street address, nor the square footage, nor the tax lot number -- unambiguously indicates the boundaries of the property to be conveyed. The street address does not indicate whether the alleyway was to be included in the conveyance, because the alleyway is immediately adjacent to the building at that address and could

reasonably be considered part of the address. The approximation of 3,027 square feet does not by itself clearly establish whether the alleyway was included, because the agreement does not specify how that approximation was reached. The approximation does tend to suggest, however, that the alleyway was intended to be included in the conveyance, because it is undisputed that 1230 9th Street measures 3,026.4 square feet with the alleyway and 2,777.5 square feet without the alleyway.[3] Finally, the tax-lot number does not indicate whether the alleyway was included, because the parties concede that the tax-lot number does not accurately indicate the boundaries of the property to be conveyed. Tax lot 878 corresponds to the front portion of the property, but does not encompass the back portion of the property, which everyone agrees was intended to be conveyed. Because nothing in the purchase agreement clearly indicated whether the alleyway was included in the property to be conveyed, reasonable parties could have had different beliefs about whether Ms. Sahrapour had contracted to purchase the alleyway. Thus, we conclude that the purchase agreement is ambiguous on that point.

---

[3] The parties dispute whether the purchase agreement in this case was a sale "in gross," i.e., whether the statement of the area to be conveyed was a mere estimate that was not "of the essence of the contract." *See generally, e.g.*, *Cavacos v. Sarwar*, 545 A.2d 46, 52 (Md. 1988) (internal quotation marks omitted). We have not found any case discussing the "sale in gross" doctrine under District of Columbia law. Under Maryland law, extrinsic evidence is apparently admissible when it is unclear from the face of the contract whether the contract is a sale in gross. *See, e.g.*, *Witmer v. Bloom*, 288 A.2d 323, 325 (Md. 1972). Moreover, even if the purchase agreement in this case were a sale in gross, we would still view the purchase agreement and the deed as ambiguous, for the other reasons stated in text.

The trial court indicated that, even if there were ambiguity, extrinsic evidence may not be considered unless there is clear and convincing evidence of mutual mistake. We disagree. Extrinsic evidence may be admitted either in the face of ambiguity or in cases of mutual mistake. *E.g.*, *DSP Venture Grp.*, 830 A.2d at 852 (the language of a contract governs "unless the written language is not susceptible of a clear and definite under[standing], *or* unless there is fraud, duress, or mutual mistake") (emphasis added).

Appellants argue that, once extrinsic evidence is considered, the purchase agreement should properly be understood to include the alleyway. Appellants further argue that they obtained equitable title to the alleyway when the purchase agreement was executed. The trial court did not address these issues, and we leave them for the trial court on remand.

**B.**

We next turn to the interpretation of the October 2006 deed. The deed stated that Shaw Centre conveyed to Ms. Sahrapour "Lots 21 and 28 in Ambrose Roth's Subdivision of Lots in Square 368 . . . . TOGETHER WITH . . . the alleys . . .

thereto belonging, or in anywise appertaining . . . ." The disputed alleyway is immediately adjacent to Lots 21 and 28. The deed does not indicate whether this alleyway is an alleyway belonging or in anywise appertaining to the property otherwise to be conveyed. This reference to alleyways contributes to our conclusion that the deed is ambiguous. *See Annapolis Rds. Prop. Owners Ass'n v. Lindsay*, 45 A.3d 749, 758-70 (Md. Ct. Spec. App. 2012) (affirming trial court's rulings that (1) plain language of deed transferring lot 19 and alleys and ways "belonging or in anywise appertaining" was ambiguous as to whether deed transferred strip of land adjacent to lot 19; and (2) after consideration of other evidence, deed was properly interpreted to transfer adjacent strip of land), *aff'd in part and rev'd in part on other grounds*, 64 A.3d 916 (Md. 2013); *Kirkpatrick v. Brown*, 59 Ga. 450, 450-53 (1877) (deed that transferred south half of lot 27, with "the rights, members, and appurtenances thereof . . . belonging, or in anywise appertaining," was ambiguous as to whether deed transferred strip of property adjacent to south half of lot 27; trial court appropriately permitted consideration of extrinsic evidence, and jury permissibly found that adjacent strip of property was alleyway transferred by deed).

Moreover, the deed identifies the tax-lot numbers of the conveyed property as "Square 368, Lots 877 and 878." Tax lot 877 does not exist, and tax lot 878

makes up only a part of Lots 21 and 28. Because tax lot 877 does not exist and tax lot 878 is smaller than Lots 21 and 28, the physical descriptions of the property in the deed are unclear and to a degree contradictory. The parties have not cited, and we have not found, local cases addressing whether such conflicts create ambiguity permitting consideration of extrinsic evidence. Other courts, however, have held that deeds were ambiguous, and extrinsic evidence therefore was properly considered, where the property description in the deed was incomplete or contradictory. *See, e.g.*, *Everett v. Bosch*, 50 Cal. Rptr. 813, 818 (Dist. Ct. App. 1966) (deed ambiguous because description of property by metes and bounds conflicted with description of property by lot number); *Grimes v. Jordan*, 260 S.W.2d 220, 223-24 (Tex. Civ. App. 1953) (same); *Snow v. Gallup*, 123 S.W. 222, 224-26 (Tex. Civ. App. 1909) (extrinsic evidence admissible where description of property in deed omitted one of property descriptors necessary to enclose area intended to be conveyed).

Appellees argue that the problems with the tax-lot numbers in the deed do not give rise to ambiguity, because property in the District of Columbia must be described in terms of subdivision lot numbers. Although properties may be described in terms of subdivision lot numbers, appellees have not cited any provision that requires that means of describing property. *See* D.C. Code § 1-1322

(2012 Repl.) (purchaser of subdivided property *may* refer to plat and record in describing property). Nor have appellees cited any authority suggesting that references to the subdivision lot numbers is dispositive even in the face of other contradictory or ambiguous descriptions of the property to be conveyed. We therefore are unable to accept appellees' contention that the subdivision lot numbers are controlling in the current setting.

We need not decide whether the problems with the tax-lot numbers in the deed by themselves would suffice to render the deed ambiguous. Rather, we hold that ambiguity is created by the combination of those problems and the deed's language about the conveyance of alleyways.

## C.

The dissent concludes that, despite the errors and conflicts in the descriptions of the conveyed property, both the purchase agreement and the deed are so unambiguous as to preclude consideration of extrinsic evidence. Our analysis differs from the dissent's in a number of respects.

1. Although the dissent apparently would require a high degree of ambiguity before permitting consideration of extrinsic evidence, our

cases provide substantial support for a less rigid approach. *See, e.g.*, *Aziken v. District of Columbia*, 70 A.3d 213, 219 (D.C. 2013) ("Where there is some lack of clarity in the terms of the contract, testimony regarding the intent of the parties and the meaning of the terms in the context may be required, and will properly be admitted in order to reach an objective interpretation.") (brackets, ellipses, and internal quotation marks omitted).

2. The dissent understands Section 203 of the Restatement of Contracts (Second) to forbid consideration of extrinsic evidence to resolve a conflict between more specific and more general contract terms. We understand Section 203 otherwise. In the first comment to Section 203, the authors of the Restatement explain that the principles of contract interpretation reflected in Section 203 "apply only in choosing among reasonable interpretations. They do not override evidence of the meaning of the parties, but aid in determining meaning or prescribe legal effect when meaning is in doubt." *Restatement (Second) of Contracts* § 203, cmt. a (1981). More specifically, comment e to Section 203 states that the rule favoring specific terms over general terms "yields to manifestation of a contrary intention." *Id.* at cmt. e. Section 203 therefore does not support a rule that extrinsic evidence may never be

considered to help resolve a conflict between more specific and more general contract language. Although the dissent suggests that this court adopted such a flat rule in *Abdelrhman v. Ackerman*, 76 A.3d 883, 891 (D.C. 2013), we disagree. The court in *Abdelrhman* stated only that "greater weight" is given to specific language, not that such language must always be given controlling weight. Moreover, the court rested primarily on the conclusion that the allegedly conflicting language could be reconciled. *Id.* at 890-91. Out-of-jurisdiction authority supports the conclusion that extrinsic evidence may in appropriate circumstances be considered in resolving a conflict between general and more specific contractual language. *See, e.g.*, *Yerington v. La–Z–Boy, Inc.*, 124 S.W.3d 517, 521-23 (Mo. Ct. App. 2004) (finding contract ambiguous where apparent conflict between general language and more specific language; reversing for trial court to consider extrinsic evidence); *Mulla v. Maguire*, 783 A.2d 93, 99 (Conn. App. Ct. 2001) ("Because the conflict between the specific intent clause and the map showing the right-of-way and the general granting clause introduces some ambiguity into the instrument, we also consider extrinsic evidence . . . ."); *see generally, e.g.*, *Thompson on Real Property* § 90.02(d)(1) (3d Thomas ed. 2013)

(The "presumption favoring specific description will prevail unless it appears that the parties intended otherwise . . . .").

3. Similarly, the dissent appears to interpret Section 203 of the Restatement to preclude consideration of extrinsic evidence to resolve a conflict between a handwritten contract term and a typed or printed contract term. The commentary to the Restatement contradicts such an interpretation. *Restatement (Second) of Contracts* § 203, cmt. f (1981) (rule generally favoring handwritten contract terms "yields to manifestation of a contrary intention").

4. The dissent further suggests that the descriptions of the property using subdivision square and lot numbers as a matter of law trump the descriptions using tax lot numbers. That is so, according to the dissent, because (a) subdivision lots in the pertinent square are on average smaller than the tax lots in that square; (b) each subdivision lot is wholly contained within a single tax lot; (c) references to subdivision lots are therefore more specific than references to tax lots; and (d) references to subdivision lots therefore control and preclude the admission of extrinsic evidence to help resolve the conflicting descriptions. As we have already explained, we do not agree that the more specific of two conflicting descriptions of property will necessarily control, without regard to other

indications of the parties' intent, including extrinsic evidence where appropriate. Leaving that aside, subdivision lot numbers and tax lot numbers seem comparably specific ways to describe the location of a property. Although the dissent indicates that each subdivision lot is contained within a single tax lot, that is not clear to us from the record. Moreover, we see no reason why controlling weight should be given in this case to the references to subdivision lots simply because subdivision lots are on average smaller than tax lots in the particular square where the property is located. Nor are we aware of any authority supporting such an approach. *See generally, e.g.*, 14 *Powell on Real Property* § 81A.05[3][c], at 81A-97 (2015) ("The practical difficulty in employing [the rule favoring specific language over general language] is the determination of which language is more general and which is more specific. [In some cases,] . . . the descriptions seem to be equally general[, and the] selection of one over the other depends largely on the opinion and viewpoint of the finder of fact.") (citation omitted).

5. The dissent also concludes that the parties intended the subdivision lot numbers to be controlling, because subdivision lot numbers are used in recording deeds, whereas tax lot numbers are used "only for the taxation of real estate." Although subdivision lot numbers are a permissible way

to describe property for real-estate purposes, there is no requirement that they be used. *See, e.g.*, D.C. Code § 1-1322 (2012 Repl.) (permitting but not requiring use of subdivision square and lot numbers). Moreover, it is not unusual for parties to use tax lot numbers to describe property being conveyed. *See, e.g.*, *Mueller v. Bohannon*, 589 N.W.2d 852, 855-56 (Neb. 1999); *Howe v. Greenleaf*, 320 P.3d 641, 649-50 (Or. Ct. App. 2014). We see no basis to infer that the parties intended to give the subdivision lot numbers controlling effect in the event of a conflict with the tax lot numbers. Nor, for that matter, are we aware of authority holding that subdivision lot numbers are generally to be given preference over tax lot numbers.

6. The dissent states that "metes and bounds generally control when they conflict with other descriptions of land unless . . . the metes and bounds descriptions themselves are incomplete." This case, however, does not involve "metes and bounds" descriptions. *See, e.g.*, B. Garner, *Black's Law Dictionary* 1141 (10th ed. 2009) (defining "metes and bounds" as "[t]he territorial limits of real property as measured by distances and angles from designated landmarks and in relation to adjoining properties"); 14 *Powell* § 81A.05[2][b], at 81A-83 (discussing "metes and bounds" method of describing real property). Rather, the conflicting

descriptions in this case involve two different systems by which the government designates parcels of real property. *See generally, e.g.*, 14 *Powell* § 81A.05[2][d], at 81A-92 (describing use of "plats" to describe real property); 11 C.J.S. *Boundaries* § 16 (2008) ("A 'plat' is a subdivision of land into lots, streets, and alleys, marked upon the earth, and represented on paper."). More generally, it is true that some courts have identified various canons of construction concerning the relative weight to give to differing types of property description when a document contains conflicting descriptions. *See generally, e.g.*, 14 *Powell* § 81A.05[3][a], at 81A-94- to -111. This court does not appear to have squarely addressed the issue, however. Moreover, according to one treatise, "some of [these canons of construction] are of questionable merit or have fallen into disuse." *Id.* at 81A-94. According to the same treatise, "it is essential that a court first attempt to determine and interpret the intention of the parties from the documents and the surrounding circumstances before applying any of the canons of construction." *Id.* at 81A-95. We need not delve further into these issues in this case, except to say that, for the reasons we have explained, we conclude that the purchase agreement and the deed in this case are ambiguous and that

extrinsic evidence should therefore be considered to help determine their meaning.

7. In *Everett*, 50 Cal. Rptr. at 818, the court concluded that a deed containing conflicting descriptions of the property to be conveyed was ambiguous. The dissent suggests that *Everett* rests on unusual features of California law, but the features the dissent identifies are not relevant to the pertinent holding of *Everett* -- that extrinsic evidence may be consulted when a deed contains two conflicting descriptions of the property to be conveyed. 50 Cal. Rptr. at 818. In any event, there is ample other authority to the same effect. *See generally, e.g.*, 12 Am. Jur. 2d *Boundaries* § 103, at 478 (2009) ("Parol evidence is always admissible to explain conflicts between calls in a description [of real property being conveyed], or a variance between a description of land in the deed and the plat or map of the land referred to therein . . . .") (citing cases); 23 Am. Jur. 2d *Deeds* § 249, at 255-56 ("If there are conflicting descriptions which cannot be reconciled, that construction will be adopted which best comports with the manifest intention of the parties as shown by the whole deed and the circumstances of the case.") (citing cases); *cf.* 23 Am. Jur. 2d *Deeds* § 194, at 217 ("[A]ll uncertainties in a conveyance are treated as ambiguities to be clarified by resort to the

intention of the parties as gathered from the instrument itself, the circumstances attending and leading up to its execution, and the subject matter and the situation of the parties as of that time.") (citing cases); 11 C.J.S. *Boundaries* § 3, at 72 ("The important and controlling consideration, where there is a conflict as to a boundary, is the parties' intention, whether express or shown by surrounding circumstances.").

8. The dissent expresses the view that the purchase agreement placed on the buyer the burden of ensuring the correctness of the legal description of the property. Specifically, the dissent relies on provisions in the purchase agreement indicating that the property was being sold "as is." Those provisions, however, are by their terms focused on the condition of the property, not on the legal description of what property was being conveyed. *See, e.g.*, *Pitre v. Twelve Oaks Trust*, 818 F. Supp. 949, 951 (S.D. Miss. 1993) ("'As is'", when utilized in the sale of real property, means the property will be sold in its then existing physical condition."). We therefore do not view the "as is" clauses as fatal to appellants' claims that, properly interpreted, the purchase agreement and the deed conveyed the alley at issue.

9. Finally, we disagree with the dissent's interpretation of the clause in the deed conveying not only the property otherwise described but also "the

rights, alleys, ways, waters, privileges, appurtenances and advantages thereto belonging, or in anywise appertaining." According to the dissent, such language can only create an easement, as opposed to determining the boundary of the land being conveyed. The sole District of Columbia case cited by the dissent, however, involves circumstances critically different from those of the present case. *See May v. Smith*, 14 D.C. (3 Mackey) 55, 59-60 (1884). The question in *May* was whether a deed conveying described property and "ways, rights, . . . and appurtenances unto the same" also conveyed title to, or an easement over, a strip of land retained by the seller, in order to get access to a nearby alley. *Id.* at 56. The deed did not refer to the alley, the alley was not adjacent to the property described in the deed, and there was no preexisting way across the strip of land at issue. *Id.* at 55-64. *May* therefore does not support a conclusion that language explicitly conveying alleys belonging or in anywise appertaining to a described property can never convey title to an alley adjacent to the described property. Moreover, contrary to the dissent's suggestion, the Maryland Court of Special Appeals in *Annapolis Roads Property Owners Ass'n* squarely held, on the basis of all of the relevant circumstances including extrinsic evidence, that a deed conveying alleys and ways "belonging or in anywise appertaining" to the

property otherwise described in the deed conveyed title to a strip of land adjacent to the described property. 45 A.3d at 751 & n.1, 759, 768, 787 (strip of land at issue was "between Lots 18, 19, 20, and 21," but title to strip of land was conveyed by deed conveying Lot 19 and alleys and ways "belonging or in anywise appertaining"). To be clear, we do not hold as a matter of law that the deed in this case granted appellants title to the alley. A substantial body of out-of-jurisdiction law addresses whether references in particular deeds to roads, ways, alleys, rights-of-way, or other related items convey title or instead only create an easement, and the answer to that question can be very context-dependent. *See, e.g.*, *Barber v. Southern Ry. Co.*, 274 S.E.2d 336, 337 (Ga. 1981) ("It is true that in determining whether an interest conveyed is an easement or fee simple title to land, each case depends on its own particular facts and circumstances."); *see generally* A.M. Swarthout, Annotation, *Deed as Conveying Fee or Easement*, 136 A.L.R. 379, § II.b.2 (1942 & 2015 supp.) (language in deed conveying land generally implies grant of title, whereas language conveying right to use land generally implies grant of easement, but other indications in deed, such as reference to land as road, way, or alley can affect interpretation of deed; "The nature of such indic[ations] varies to such an extent from case

to case that it seems unwise to attempt to formulate any general rules with respect to the effect of any given indic[ation] upon the broad principle that a conveyance of a strip or parcel of land, rather than a right, will pass a title in fee."); *see also id.* at § II.d ("It appears to be well established that a deed purporting to convey a 'road,' 'roadway,' 'alley,' 'street,' 'highway,' or 'way,' will, in the absence of some indic[ation] of a contrary intention of the parties, be construed as passing an easement only and not a title in fee. (It should be pointed out, however, that in many of the cases in which this result is reached the decision is not based entirely, or even partly, upon the principle that a deed purporting to convey a 'road,' etc., passes only an easement, but upon other indications of the parties' intention that an easement only should pass.)"). Rather, we hold only that the deed's language conveying alleys and the deed's conflicting descriptions of the property to be conveyed combine to make the deed sufficiently ambiguous as to warrant consideration of extrinsic evidence. We leave to the trial court on remand the question whether, under all of the circumstances, the reference to alleys in the deed in this case operated to convey title.

## IV.

In sum, we find that both the purchase agreement and the 2006 deed are ambiguous.  Extrinsic evidence therefore should be considered in determining the meaning of those documents.  We thus remand the case for further proceedings.

*So ordered.*

NEWMAN, *Senior Judge*, dissenting:  Sahrapour failed to properly examine land conveyed by a deed and land purchase agreement.  The two documents may convey smaller parcels of land than Sahrapour subjectively intended to purchase; this court should not intervene to correct her missteps absent a sufficient showing of ambiguity in the documents.  The majority's opinion departs from this court's opinion in *Abdelrhman v. Ackerman*, 76 A.3d 883 (D.C. 2013), and implicitly adopts the dissent's method of resolving inconsistencies and ambiguities.  *Id.* at 893 (McLeese, J., dissenting).

I dissent from the majority's opinion because, in my view, neither the land purchase agreement nor the deed is sufficiently ambiguous as to permit the introduction of extrinsic evidence.  In addition, I conclude that the corrected deed is void and that Sahrapour did not acquire the alley through equitable conversion.  I would affirm the trial court's decision.[1]

---

[1]  Whether Sahrapour might have other remedies is not an issue before us.

**Deed**

Under the objective law of contracts, this court solely relies on the language of the written document to discern the intent of the parties "unless the written language is not susceptible of a clear and definite undertaking, or unless there is fraud, duress, or mutual mistake." *DSP Venture Grp., Inc. v. Allen*, 830 A.2d 850, 852 (D.C. 2003) (citation and internal quotation marks omitted). Ambiguity exists only if the court determines that the proper interpretation of the contract cannot be derived from the contractual language exclusively, and requires consideration of evidence outside the contract itself. *Steele Founds., Inc. v. Clark Constr. Grp., Inc.*, 937 A.2d 148, 153 (D.C. 2007).

The Second Restatement of Contracts presents the following method for contract interpretation:

> In the interpretation of a promise or agreement or a term thereof, the following standards of preference are generally applicable:
>
> (a) an interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect;
>
> (b) express terms are given greater weight than course of performance, course of dealing, and usage of trade,

course of performance is given greater weight than course of dealing or usage of trade, and course of dealing is given greater weight than usage of trade;

(c) specific terms and exact terms are given greater weight than general language;

(d) separately negotiated or added terms are given greater weight than standardized terms or other terms not separately negotiated.

Restatement (Second) of Contracts § 203 (1981). This court follows § 203 and applies the canon that the specific governs the general when both the general and specific provisions "stand irreconcilably in conflict." *Abdelrhman*, *supra*, 76 A.3d at 891. Unlike the canon 'construing the contract against the drafter,' which applies only after considering extrinsic evidence,[2] the 'specific governs the general' canon applies before considering extrinsic evidence. *Id.*

The panel in *Abdelrhman* split regarding the amount of ambiguity needed before extrinsic evidence of the parties' intent was admissible. Judge McLeese

---

[2] "Ambiguous language in a contract is generally construed against the drafter, at least where the parties were relatively equal in bargaining power. A party who takes an agreement prepared by another, and upon its faith incurs obligations or parts with his property, should have a construction given to the instrument favorable to him. This canon of construction, known as *contra proferentem*, is a secondary standard of interpretation, and inferior to extrinsic proof of the parties' agreement, or to other authority revealing that understanding." *American Bldg. Maint. Co. v. L'Enfant Plaza Props., Inc.*, 655 A.2d 858, 862-63 (D.C. 1995) (citations and internal quotation marks omitted).

dissented in *Abdelrhman* because he "would hold that, when considered as a whole, the language of the lease at issue was ambiguous and that extrinsic evidence therefore should be considered in interpreting that language." *Id.* at 893 (McLeese, J., dissenting). In particular, Judge McLeese's dissent recognized the 'specific governs the general canon' but would not have relied "on the implication of a specific provision as unambiguously trumping the express statement of a more general provision" in this specific case. *Id.* at 894 (McLeese, J., dissenting). The majority disagreed and found that the two provisions of the lease could be read together, so there was no need to use the 'specific governs the general' canon to resolve the inconsistency in the lease language. *Id.* at 891. Today, the majority's opinion essentially takes Judge McLeese's dissent in *Abdelrhman* and makes it binding precedent, in derogation of *M.A.P. v. Ryan*, 285 A.2d 310 (D.C. 1971).

There are two provisions in the deed that stand irreconcilably in conflict, the description of the land, "Lots 21 and 28 in Ambrose Roth's Subdivision of Lots in Square 368," and the tax lots numbers, "*Lot 878 in square 368*" and "Tax ID: Square 368, Lots 877 and 878" (handwritten text in italics). The conflict in tax identification (Tax ID) numbers can be resolved in favor of the handwritten portion, "*Lot 878 in square 368*." Restatement (Second) of Contracts § 203 cmt. f

(1981) ("It is sometimes said generally that handwritten terms control typewritten and printed terms, and typewritten control printed.").

The second conflict is between "Lots 21 and 28" and "*Lot 878 in square 368.*" The individual lot numbers are, on average, smaller and more specific than the Tax ID lot numbers. Square 368 is divided into eighteen lots and eight tax lots so, on average, the lot numbers provide a more specific description of individual pieces of land than the tax lot numbers. The subdivision lots are wholly contained within the tax lots so subdivision lots are more specific than tax lots—not merely a different method to describe the same land. The canon that "specific terms and exact terms are given greater weight than general language" resolves this inconsistency. Restatement (Second) of Contracts § 203 (c). The individual lot reflects a smaller parcel of land, and is therefore more specific than the tax lot which reflects, on average, a larger parcel of land.

In addition, the method by which land is recorded in the District reflects the above reading of the deed. In the District of Columbia, the Office of the Surveyor uses lots of record to identify and record land records, but tax lot numbers are only used for the taxation of real estate located in the District of Columbia. D.C. Code §§ 1-1305–1322 (2012 Repl.) (land records); D.C. Code § 47-701 (2012 Repl.)

(taxation of real estate).  Given that the deed contains two inconsistent descriptions of land—one of which accurately cites to two plots of land in the same form used by the Office of the Surveyor when recording deeds, and the other which cites to a non-existent tax lot—I conclude that the parties intended the subdivision lot numbers to reflect the scope of the land conveyed by the deed.

The majority's opinion cites California and Texas cases for the proposition that, when descriptions of land in the deed are in conflict, the more specific terms do not necessarily control.  These cases are distinguishable.[3]  Despite the majority

---

[3]  Courts often disagree about the degree of ambiguity needed before a court can consider extrinsic evidence to discern the intent of the parties.  The majority opinion cites cases from other states that do not follow this court's method for resolving inconsistencies, and thus reduces the usefulness of those opinions.

Under California law, courts apparently do not apply canons of construction to resolve inconsistencies prior to considering extrinsic evidence.  In cases where "metes and bounds [descriptions] clearly conflict[] with its description by lot number," "consideration may be given not only to actual uses being made at the time of the grant, but also to such uses as the facts and circumstances who were within the reasonable contemplation of the parties at the time of the conveyance." *Everett v. Bosch*, 50 Cal. Rptr. 813, 818 (Dist. Ct. App. 1966) (citation and internal quotation marks omitted).  In addition, California law contains unique statutory and common law presumptions whereby "[a]n owner of land bounded by a road or street is presumed to own to the center of the way, but the contrary may be shown" and "[t]he grant of land adjoining a street or highway which has been wholly made from, and upon the margin of, the grantor's land is deemed to comprehend the fee in the whole of the street." *Id.* at 817 n.2, 819 n.3. (citations and internal quotation marks omitted) ("[A] grantor's intent to withhold his interest in an alley . . . will never be presumed, reasoning that there would be no object in the retention by the

opinion's contention otherwise, metes and bounds generally control when they conflict with other descriptions of land unless if the metes and bounds descriptions themselves are incomplete. 11 C.J.S. *Boundaries* § 84 (2015) ("Metes and bounds in the description of property granted, if established, always control courses and distances.").

The majority's opinion also contends that language located at the end of the deed referencing "alleys" supports Sahrapour's argument that the deed is ambiguous. The deed states, "TOGETHER WITH all improvements thereupon, and the rights, alleys, ways, waters, privileges, appurtenances and advantages thereto belonging, or in anywise appertaining." Courts have held for over 130 years that this language unambiguously states that certain features (easements and covenants) travel with the land.[4] *See May v. Smith*, 14 D.C. (3 Mackey) 55, 59-60 (1884) (quoting *Oliver v. Hook*, 47 Md. 301, 308 (1877)).

---

grantor of a narrow strip of land, which, when separated from the adjoining land, would be of little or no use to him.").

The metes and bounds descriptions, referenced in the two Texas cases cited by the majority opinion, were incomplete and problematic so the court therefore could not discern intent solely from those descriptions. *Grimes v. Jordan*, 260 S.W.2d 220, 223 (Tex. Civ. App. 1953); *Snow v. Gallup*, 123 S.W. 222, 224 (Tex. Civ. App. 1909).

[4] Maryland courts have held that this language in the deed validly assigns "covenants [or easements] running with the land," but none have held that this

In *May*, this court had to consider whether the language in the deed, "together with all and singular the improvements, ways, rights, tenements, and hereditaments and appurtenances unto the same belonging or in any way appertaining," conveyed "a right of way over the remaining part to the public alley" that bordered the property described in the deed. *Id.* at 57. This court relied upon *Oliver* for the proposition that the deed language, "all and every the rights, privileges, appurtenances and advantages to the same belonging, or in any wise appertaining," would transfer a pre-existing easement through the deed. *Id.* at 59 (internal quotation marks omitted) (quoting *Oliver*, *supra*, 47 Md. at 308). The factual inquiry that ensued focused on whether there was a pre-existing easement over the public alley, not whether the deed conveyed title to the alley. *Id.* at 59-61.

language delineates the boundaries of a property. *County Comm'rs of Charles Cnty. v. St. Charles Assocs. Ltd. P'ship*, 784 A.2d 545, 568 (Md. 2001); *see also Olde Severna Park Improvement Ass'n, Inc. v. Gunby*, 936 A.2d 365, 373 (Md. 2007); *Kobrine, L.L.C. v. Metzger*, 846 A.2d 403, 414 (Md. 2004) (It is well-settled Maryland law that "when a property owner subdivides property and makes or adopts a plat designating lots as bordering streets, and then sells any of those lots with reference to the plat, an implied *easement of way* passes from the grantor to the grantee . . . over the street contiguous to the property sold" (emphasis added) (internal quotation marks omitted)); *Conrad/Dommel, LLC v. West Dev. Co.*, 815 A.2d 828, 839 (Md. 2003); *Gosnell v. Roberts*, 128 A. 276, 276-77 (Md. 1925); *Duvall v. Ridout*, 92 A. 209, 210 (Md. 1914).

In my view, as established in *May*, this unambiguous language is not intended to delineate the exact geographical boundaries of the land, but instead is intended to clarify what features of the property the parties intend to transfer with the deed. I see no reason to depart from 130 years of well-established case law to find an ambiguity in Sahrapour's deed.

The majority opinion cites *Annapolis Rds. Prop. Owner's Ass'n v. Lindsay*, 45 A.3d 749, 784 (2012), *aff'd in part, rev'd in part sub nom. Lindsay v. Annapolis Rds. Prop. Owner's Ass'n*, 64 A.3d 916 (2013), for the proposition that the above-quoted deed language is ambiguous as to the interest it conveys. I do not read this opinion as does the majority. In *Annapolis Roads*, the Maryland Court of Special Appeals had to decide whether the "the Strip," a ten-foot strip of land located between Lots 18 and 19 but wholly contained within Lot 19's geographic boundaries, was a roadway or a way. *Id.* at 767. The court did not struggle to understand what features traveled with the land, but rather struggled to define whether "the Strip" was a way, in which case the seller would retain no easement over the way, or a roadway, in which case the seller would retain an easement. *Id.* at 768. The ten-foot strip at issue in *Annapolis Roads* clearly fell within the boundaries of Lot 19, so parties did not contest the geographic boundaries set forth in the respective deeds. *Id.* at 752 & n.3. The majority is correct that the above-

quoted deed language was referenced in the court's analysis, but it was merely used to assess whether the owner retained any "rights and interests in the beds of roadways," not whether title to the alley was actually conveyed through the deed. *Id.* at 768.

In sum, I would affirm the trial court's ruling that the deed is not ambiguous. I would rely on well-established canons of contract construction and Maryland law to reach this conclusion.

**Land Purchase Agreement**

The majority's opinion correctly concludes that the land purchase agreement does not merge with the deed but, in my view, errs in concluding that the agreement's description of the land is ambiguous.

The land purchase agreement is similar to the deed but differs in two significant ways. First, the purchase agreement does not reference the non-existent Tax ID Lot 877. Second, and more importantly, the purchase agreement states that the property to be sold is approximately 3,027 square feet. The approximately 3,027 square feet measurement is important because the size of Lot 878, referenced

in the purchase agreement, is smaller than 3,027 square feet. Regardless of the exact discrepancy in square feet between Lot 878 and the 3,027 square foot description, the parties intended the purchaser to bear the risk that the square footage description may not match the legal description of the land. We need not address whether this jurisdiction will adopt the Maryland "in gross presumption" because the parties' intent is clear from the purchase agreement.

The purchase agreement describes the relevant property as follows:

> The subject of the property, known as 1230 9th Street NW Washington D.C. 20001, is approximately 3,027 feet of land improved with an approximately 3,893 square feet building plus basement located in an area designated as historic in the Election District 2, zoned C2A, and legally described as Lots [sic] 878, Block/Square 0368, Map 40 C in the public land records of the District of Columbia together with the easements, rights, appurtenances belonging to the same, and including fixtures, furnishings, machinery, equipment owned by the Seller situated on or about said property.

Lot 878 does not describe the entire land that was actually transferred to Sahrapour because Lot 878 only corresponds to Lot 28 of the ALTA/ACSM Survey, but the deed transferred both Lot 21 and 28 of the ALTA/ACSM Survey. Regardless of the deviation of Lot 28's square footage from the approximately 3,027 square foot

description, the purchaser bore the risk of the inaccurate description.

The purchase agreement allocates certain risks to the purchaser with the following provisions: "15. LOCAL VIOLATIONS; CONDITION AND OPERATION OF PROPERTY . . . Purchaser has inspected the property, is fully familiar with the condition thereof and Purchaser agrees to take the Property AS IS as of the Date of Agreement." The Addendum to the Real Estate Purchase Agreement (Addendum) also allocates additional risks to the purchaser:

> A. FEASIBILITY STUDY PERIOD. The purchaser has a thirty (30) days Feasibility Study Period from the date of this Agreement during which Purchaser can inspect the Property, perform its studies, place financing and perform ministerial duties to settle on the Purchase. During this period, Purchase and its' [sic] employees, agents or contractors may enter into the Property upon prior notice to the Seller for the purpose of inspecting the Property, performing surveys, studies and ministerial duties it determines are necessary to determine the feasibility of purchasing the Property. Prior to the end of this Period, Purchaser may upon written notice and receipt by Seller or its' [sic] Agent terminate this Agreement in its' [sic] sole judgment. . . .
>
> D. CONDITION. The property is sold "as is" except for specific representations and warrantees made by the Seller in this contract.

The Addendum gave Sahrapour thirty days to inspect the property, Lot 28, and

allowed Sahrapour to terminate the agreement whereby the deposit would be returned. Since "approximately 3,027 square feet" is not a "specific representation . . . made by the seller," the purchase agreement and addendum place the burden of surveying and inspecting the property on the purchaser, Sahrapour.

Because Sahrapour did not properly inspect and survey the property, which would have revealed the size discrepancy, she now holds title to a piece of land that may be smaller than what she subjectively intended to purchase. Any additional land acquired through the deed is over and above what the parties intended to transfer. The land purchase agreement stated that she would receive Tax Lot 878 and, given that she signed an addendum which sold the land "as is" and gave her permission to survey and inspect the land, she bore the risk that the "approximately 3,027 square feet" description was not accurate. The fact that Tax Lot 878 is not 3,027 square feet does not create an ambiguity in the description of the property. I would not resort to extrinsic evidence to discern the intent of the parties.[5]

---

[5] Sahrapour would not acquire the disputed property through the doctrine of equitable conversion because, in my view, the Land Purchase Agreement does not intend to convey the disputed property, and in any event a valid deed was executed. Under the doctrine of equitable conversion, this court "views a contract of sale as immediately vesting the purchaser with beneficial ownership of the realty, and limiting the property interest of the vendor to the promised consideration . . . retaining legal title only as trustee for the purchaser *until the*

## Corrected Deed

Sahrapour contends that the "corrected" deed reflected a clerical edit because it did not materially alter what was conveyed in the first deed. I do not find that persuasive.

A deed is void when the attorney who drafted the deed exceeded his authority under a general power of attorney. *Smith v. Wells Fargo Bank*, 991 A.2d 20, 26-27 (D.C. 2010). A "clerical error" is "[a]n error resulting from a minor mistake or inadvertence and not from judicial reasoning or determination; [especially] a drafter's or typist's technical error that can be rectified without serious doubt about the correct reading." *Black's Law Dictionary* 659 (10th ed. 2014). "Among the numberless examples of clerical errors are omitting an appendix from a document; typing an incorrect number; mistranscribing or omitting an obviously needed word; and failing to log a call." *Id.*

The inclusion of "* and a portion of Lot 22 as shown on the attached

---

*deed of conveyance is delivered.*" *Trustee 1245 13th St., NW No. 608 Trust v. Anderson*, 905 A.2d 181, 184 (D.C. 2006) (emphasis added) (quoting *Gustin v. Stegall*, 347 A.2d 917, 922 (D.C. 1975)).

survey," changing the Tax ID to include "and a portion of Lot 885," and attaching a new survey reveals that a labor requiring original thought was needed to arrive at this edit. Merely changing "Lot 877" to "Lot 885" might be a clerical edit, especially considering Lot 887 does not exist, but these intricate edits were not indicative of mere clerical edits. Because Haas exceeded his authority under the Power of Attorney, I would hold that the trial court correctly found the "corrected" deed was void.

I respectfully dissent.[6]

---

[6] Sahrapour has filed a legal malpractice claim against Haas which is stayed pending resolution of the ownership of the disputed alley. Order to Stay, *Sahrapour v. Haas*, No. 2011 CA 647 (D.C. Super. Ct. Aug. 30, 2011).